## MITCHELL ET AL VS. BADGETT.

1. LEASE: *When a Mortgage.*
   A lease executed by lessor and lessee reserving a lien to the lessor on the crop produced on the land, is a chattel mortgage; and a written agreement, properly executed, stipulating that the amount due for rent of land should be paid before the removal of the crop, is a mortgage of the crop.

2. MORTGAGES: *Priority of Record.*
   Between conflicting mortgages, the one first filed for record will have priority

APPEAL from *Pulaski* Chancery Court.

Hon. J. R. EAKIN, Chancellor.

*Fletcher* for appellants.

———— , *contra,*

MOORE, S. J. :

This suit was brought in the Pulaski Chancery Court to the spring term, 1877, by O. K. Badgett against W. J. Mitchell and Fletcher & Barron.

The object of the suit was to obtain a decree against Mitchell for a balance of $600, claimed as due for rent of land, and against Fletcher & Barron to compel them to account for the proceeds of certain cotton the produce of the land, alleged to have been received by them from Mitchell, and on which Badgett claimed to have had a lien for his rent.

The material allegations of the bill are : That O. K. Badgett, and one N. H. Badgett entered into a written contract with Mitchell on the 7th day of April, 1876, whereby they leased to him certain land for the year 1876, for which he was to pay $900, as rent, for which amount he executed his note due and payable on the 1st day of November, 1876. Mitchell joined in and signed this contract, which *inter alia*, contained these words, after referring to the note for $900 : "And a lien is hereby given and retained upon the crops grown upon said land for the year 1876."

Mitchell further bound himself in the contract, not to re-move or dispose of any part of the crops until the note had been paid, or the consent of the lessors obtained, except six bales of cotton which the contract expressly permitted him to remove and dispose of.

There were stipulations, also, of a minor character relating to the building of a cabin, and putting up and making rails on the land, etc.

Mitchell was also to be allowed a deduction for any over-flow of a portion of the land, not to exceed three acres, at the rate of $9 per acre.

The contract was duly signed and properly acknowledged by all the parties, O. K. and N. H. Badgett and Mitchell, on the day of its execution.

It was not filed for record till the 7th day of October, 1876.

On the day of the execution of the note and contract, an endorsement was made on the note whereby it was agreed that half the amount of the same should be paid November 1st, and half, December 1st, 1876, and on the same day N. H. Badgett, by endorsement on the note assigned all his interest therein to O. K. Badgett, who consequently sued alone.

The bill charges that during the months of September, Oc-tober and November, Mitchell, without the permission and against the protest of Badgett, removed and disposed of the greater portion of the crop, whereby it was lost to him, and that the sum of $600 remained due from Mitchell after al-lowing him all credits for improvements, overflowed lands, etc. That after diligent search all the cotton that could be traced up was eleven or more bales that had been sold and delivered by Mitchell to Fletcher & Barron, and which were received by them with a knowledge of Badgett's rights, and appropriated by them on a debt due to themselves.

Sundry interrogatories were propounded to all the defen-

dants, and the bill prays for decree against the defendants for the amount that may be ascertained to be due, and that the proceeds of the cotton in the hands of Fletcher & Barron be declared and made subject to the lien of Badgett in respect to his debt, and for general relief.

Fletcher & Barron answered, denying all knowledge or notice of Badgett's lien on the crop of Mitchell, and aver that Badgett never protested against nor forbid Mitchell selling or removing the crop, though they do not aver he knew of the sale of any of the cotton to them. They admit that they purchased fifteen bales of cotton from Mitchell, during the months as charged in the bill, which they supposed was raised on the Badgett plantation, and in response to the interrogatories they file an account of the same, showing the dates and amounts, and prices paid.

They allege that they are merchants in the City of Little Rock, and engaged largely in buying cotton; that they bought the cotton in question from Mitchell in the regular course of business, and at regular market prices; that they furnished supplies to Mitchell to make his crop, and that on the 17th day of June, 1876, he executed to them a mortgage of his corn and cotton crops to secure advances already made and to be made to him.

This mortgage was filed for record on the 24th of October, 1876, which, as will be seen, was after the contract between Badgett and Mitchell had been filed.

Mitchell also answered the bill. He admits the execution of the contract with and the note to Badgett. He denies that Badgett was ignorant of his removing and disposing of his crop, and further, he denies any intention or desire to defraud Badgett, and sets up his mortgage to Fletcher & Barron given to secure indebtedness for supplies, and avers that believing he would have enough to pay his rent and the amount

due for supplies, and being anxious to pay off Fletcher & Barron as soon as possible, he from time to time sold and delivered to them fifteen bales of cotton. That contrary to his expectation his crop fell short, and that after the sales to Fletcher & Barron, a garnishment and attachment was issued against him from the United States court on a judgment against N. H. Badgett, and the balance of his crop seized thereunder. By this proceeding his crop was much wasted. The cotton and corn which was seized, was afterwards released by the United States Marshal and turned over to O. K. Badgett, and by him credited as a payment on the rent.

It is proper to state that previous to filing the answers, a general demurrer was filed to the complaint which was overruled.

Demurrers were also filed to the answers but they seem to have been abandoned, as the case (as the transcript shows) was heard and decree rendered on the bill, answers and depositions.

The evidence is voluminous and much of it entirely foreign and irrelevant to the issues.

The following seems to be clearly established by the proof:

Mitchell, early in the year 1876, rented the land by written lease from N. H. Badgett, and whilst *his* tenant, he worked on houses, etc., to the value of $20, and in making fences to the value of $75, and he claimed that he should be allowed these amounts as a credit on his rent. O. K. Badgett, in his testimony, denies all knowledge of or responsibility for this claim for credit. O. K. Badgett purchased the land from N. H. Badgett and wife in February, 1876, and filed his deed for same for record on the 7th of that month.

On the 7th of April the contract of lease, etc., referred to in the bill was executed, and the lease first made between N. H. Badgett and Mitchell was cancelled and destroyed.

The only payments on the rent that are proven to have been made since the date of this last contract, are $65 in cash, $183.95 received from the United States Marshal, and $27 deducted on account of the overflow of three acres of the land.

There is some evidence tending to show that, after the new lease was executed, O. K. Badgett agreed verbally, to allow Mitchell $95 for work done whilst he was in possession under the first lease from N. H. Badgett. The new lease, however, having been reduced to writing, and the old one cancelled, parol evidence, in the absence of fraud, or mistake, which is not charged nor proved, could not be regarded to vary the terms of the new lease.

The evidence tends to establish clearly that Fletcher & Barron, when they gave credit to Mitchell, knew that he was a tenant on Badgett's farm. Their mortgage, which is made an exhibit to their answer, describes the land on which the crop was growing, as being part of "what is called the N. H. Badgett place, in Pulaski county, etc."

Their place of business and the residence of the Badgetts was in the city of Little Rock, and it is in proof that they were acquaintances and occasionally held conversations on business matters. They had constructive notice of O. K. Badgett's ownership of the land by the recording of his deed to the land on February 7, 1876.

On the hearing, the Chancellor decreed the defendant, Mitchell, personally liable to Badgett in the sum of $600—the credits allowed not reducing the amount of the rent note below that sum—with interest at the rate of 6 per cent from January 1, 1877, and that he be ordered to pay that sum, and that execution issue,

Also decreed that Badgett had a lien on the proceeds of cotton in the hands of Fletcher & Barron, to the extent of $429.53, with interest at 6 per cent from January 1, 1877.

This amount is arrived at by allowing them to retain the pro-
ceeds of six bales of cotton, which Mitchell was authorized to
sell by the terms of the contract of lease, and charging them
with the proceeds of the balance of the fifteen bales received
from Mitchell, making an average of the value of all the bales
from the prices as shown by the account of same filed by
Fletcher & Barron.

The decree further provides that if the debt due from Mitchell
be not paid nor made by execution against him, that execution
issue against Fletcher & Barron for any deficiency to the extent
of $429.53.

The costs were imposed primarily on Mitchell, and if not
collected on execution against him, ordered that they be im-
posed on Fletcher & Barron, and included in any execution
against them.

Defendants all appealed.

The questions presented for determination are not numerous,
nor very difficult of solution.

We are first to inquire, what is the nature and force of the
contract of April 7, 1876, executed by Mitchell and Badgett?
for it is by virtue of that instrument only that the appellee
must prevail, if at all.

It is not claimed by the bill, nor in argument, that appellee
has any right to recover under the statutory lien of the land-
lord—by which he might have attached Mitchell's crop on his
attempting to remove it—in the absence of this contract.
Though he seems to have known of the crop being removed,
when he could not stop it by request or protest, he chose to
depend upon such lien and rights as he might have by his con-
tract.

That this contract has none of the characteristics of a mort-
gage, is insisted and earnestly and ingeniously maintained by
counsel for appellants.

We are referred to the case of *Barnett et al.* v. *Mason et al.*, in 7 Ark. Rep., as directly in point.

In that case the instrument by which a lien was claimed was a bill of sale of a steamboat, executed only by the vendors, and in which they used language very similar to that in the contract in this case, viz. : "they (the vendors) are to retain a lien," etc., for the unpaid purchase money. This court say in passing on the instrument, that this phrase, as used there, "is a mere suggestion of the vendors, no stipulation, and was entirely nugatory," and add that "even supposing the plaintiff had a lien on the boat, they lost it forever when they parted with its possession." There the instrument was not given by the vendee, was neither acknowledged nor recorded, and the benefit of the lien was claimed in an action of detainer, and the poesession of the boat having been parted with, the court correctly decided that in such a case they could claim nothing by their supposed lien.

The case of *Roberts et al.* v. *Jacks*, in 31 Ark. Rep., is also cited and relied on by appellants.

In that instance there is simply the statement made in a promissory note that the amount of the note was a lien, etc., and the court say : "It is certainly not a contract, no undertaking or agreement,  *   *   *  but simply the declaration of the effect of a contract made." Unquestionably, this was right. If such a statement in a promissory note could create a valid lien, where would be the necessity for ever taking a mortgage to secure a note, or the necessity or value of ever recording any instrument?

Other cases are referred to by appellants, but on close examination they are all found to rest or turn on some particular circumstance and facts, and to be totally different from the case at bar.

Here we have a formal written instrument executed by both

parties, the lessors and the lessee, and duly acknowledged at the date of its execution by all the parties to it, and afterwards duly recorded ; an express lien is reserved by the one and given by the other party.

It is unquestionably a lease *to* Mitchell ; is it a mortgage *from* Mitchell ? In addition to the express lien given and reserved, it contains this clause :  " No part of which (the crops) shall be removed or disposed of in any way by the party of the second part (Mitchell) or his agents until said note has been paid or the consent of the said party of the first part (Badgett) obtained."

Herman, in his late work on Chattel Mortgages, p. 68, says : " Leases, with conditions, are mortgages.   Any condition in " a lease giving the lessor a lien upon the tenant's property as " security for the rent, is a chattel mortgage.   *   *   *   So a " written agreement, properly executed, stipulating that the " amount due for rent of land should be paid before the crops " are removed, is a mortgage of the crop."

The same doctrine is asserted in *Johnson* v. *Crofoot*, 53 Barbour (N. Y.), p. 574.   It is there held that a lease providing that the lessor was to have full title, with the privilege of taking possession of the produce of the farm in payment of any balance due on rent, was a chattel mortgage, and if not recorded, was invalid as against an attaching creditor of the lessee.

The case under consideration falls distinctly within the doctrine above announced.   The instrument here is not only a lease with a condition, and containing a stipulation that the crop should not be removed till the rent was paid, but it is also executed by the lessee, and duly acknowledged by him.   It is to all intents and purposes a chattel mortgage.

And now, having decided the contract to be in effect a mortgage from Mitchell to Badgett, we are next to inquire, how are the other defendants, Fletcher & Barron, affected by it?

That they had a valid mortgage, also from Mitchell, is not disputed. Badgett's mortgage, whilst of course it is binding and conclusive as against Mitchell, without being recorded or even acknowledged, could only affect Fletcher & Barron, or any other third party, from the date of its being filed for record.

Both appellant and appellee were extremely negligent in regard to recording their mortgages. Appellee may have considered his as only a cumulative or additional security to his statutory lien as landlord, and not regarded it as all important until he found the crop was being removed. Having filed it, however, prior to that of Fletcher & Barron, his rights were preserved.

All the circumstances, as well as the proof, tend to show that Fletcher & Barron gave credit to Mitchell, knowing that he was the tenant of appellee. This alone was enough to advise them that, as landlord, he would have a statutory lien on the crop of Mitchell, and sufficient to put them on inquiry as to the amount he would be due to appellee, and the extent and exact nature of the lien.

Having a valid subsisting mortgage lien on the crops of Mitchell after the cotton was removed and disposed of, appellee had the right to follow and recover the property or its value from Fletcher & Barron, who received it with constructive notice of appellee's lien by the filing of the mortgage or contract for record.

They were affected with a trust upon every part of the cotton which they received after the filing of appellee's mortgage for record, except enough to make the amount of six bales, which Mitchell was authorized to dispose of.

This principle is elementary. Herman, p. 345, states the general doctrine in few words, as follows: "A mortgagee may "recover the property, or its equivalent in whosesoever hands

" it may be at the time he is entitled to it, for the purpose of " satisfying his debt."

See also *Grouler* v. *Asseler*, 22 N. Y., 225 ; *Duke* v. *Stickler*, 43 Ind., 494.

There is nothing in the evidence to lead to the belief that the appellee, by any act of his, ever waived his lien and rights acquired under it, or estopped himself from asserting his lien rights. The evidence nowhere shows that he was ever present, or had any actual knowledge of the sale of any of the cotton, when made to Fletcher & Barron, or that he' did or suffered any other act that would amount to an estoppel.

The calculation by which the Chancellor in the court below arrived at the amounts specified in the decree seems to be correct, and warranted by the pleadings and evidence.

Finding no error in the decree of the Pulaski Chancery Court, the same is, in all things, affirmed.

Hon. J. R. Eakin, J., did not sit in this case.